**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

GREAT LAKES COMMUNICATION
CORPORATION,

              Plaintiff,

vs.

AT&T CORP.,

              Defendant.

No. C13-4117-DEO

*REPORT AND
RECOMMENDATION*

———————————

*TABLE OF CONTENTS*

I.      **INTRODUCTION**................................................................ 3

II.    **PROCEDURAL HISTORY** ............................................... 3

III.   **REGULATORY BACKGROUND**..................................... 4

IV.   **GLCC'S COMPLAINT** ................................................... 10

V.    **AT&T's COUNTERCLAIM** ........................................... 11

VI.   **THE MOTION TO DISMISS** ......................................... 11
      **A.**    *Applicable Standards*.............................................. 12
      **B.**    *Analysis*................................................................. 13
           **1.**   *Standing*............................................................ 13
           **2.**   *Counterclaim Count I* ..................................... 15
                 *a.*    *Overview* ................................................ 15
                 *b.*    *Summary of the Arguments*................... 16
                 *c.*    *Discussion* .............................................. 18
                       *i.*    *Has AT&T Alleged That No Fees Are Being
                             Paid?* ...................................... 18
                       *ii.*   *Is The Allegation Plausible?*........................... 19
           **3.**   *Counterclaim Count II* .................................... 22
                  *a.*    *Overview* ................................................ 22

|  |  | b. | Summary of the Arguments | 23 |
|--|--|----|--------------------------|----|
|  |  | c. | Discussion | 24 |
|  | 4. | **Counterclaim Count III** | | 28 |
|  |  | a. | Overview | 28 |
|  |  | b. | Summary of the Arguments | 28 |
|  |  | c. | Discussion | 29 |

VII. **THE MOTION FOR SUMMARY JUDGMENT** ................................. 33

A. Applicable Standards ................................................................ 33

B. Undisputed Facts ...................................................................... 35

C. Summary of the Arguments ...................................................... 37

D. Discussion ................................................................................ 38

    1. Is There a Genuine Issue of Material Fact as to Whether AT&T is a Buyer Under the Tariff and, Therefore, Subject to its Billing Dispute Requirements? ...................... 38

    2. If AT&T is a Buyer, is GLCC Entitled to Summary Judgment Based on AT&T's Failure To Comply With the Tariff's Billing Dispute Requirements? ............................ 40

        a. Notice Requirements ............................................. 41

        b. Payment Requirement ........................................... 44

VIII. **CONCLUSION AND RECOMMENDATION** .................................... 46

# I.    INTRODUCTION

This case is before me on plaintiff's motion (Doc. No. 17) to dismiss and for summary judgment.  Defendant has filed a resistance (Doc. No. 20) and plaintiff has filed a reply (Doc. No. 24).  The Honorable Donald E. O'Brien, Senior United States District Judge, has referred the motion to me pursuant to 28 U.S.C. § 636(b) to conduct any necessary hearings and to issue a report and recommendation.  *See* Doc. No. 27.  I heard oral arguments on May 29, 2014.  Attorneys Jeana Goosmann, David Carter and Joseph Bowser appeared for plaintiff.  Attorneys Richard Lozier and Michael Hunseder appeared for defendant.  The motion is now fully submitted.

# II.    PROCEDURAL HISTORY

Plaintiff Great Lakes Communication Corporation (GLCC) commenced this action against defendant AT&T Corp. (AT&T) on December 18, 2013.  GLCC's complaint (Doc. No. 1) asserts various causes of action through which it seeks to recover payments allegedly owed to it by AT&T.  GLCC also seeks declaratory relief.

GLCC alleges that it is an Iowa corporation that operates as a local exchange carrier (LEC), meaning it "provides interstate and intrastate exchange access service, as well as local, long distance and enhanced services to residential and business telecommunications customers."  Doc. No. 1 at ¶ 4.  GLCC contends AT&T is a New York corporation that operates as an interexchange carrier (IXC) and is a common carrier subject to the provisions of the Communications Act, 47 U.S.C. § 151 *et seq.* (the Act).  *Id.* ¶¶ 5-6.  GLCC alleges subject matter jurisdiction via both federal-question and diversity jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.  *Id.* at ¶ 7-8.  It further alleges supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.  *Id.* at ¶ 9.

On January 31, 2014, AT&T filed an answer and counterclaim (Doc. No. 11). On March 3, 2014, GLCC filed its pending motion to dismiss and for summary judgment. GLCC seeks entry of an order (a) dismissing AT&T's counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6) and (b) holding AT&T liable to GLCC as a matter of law pursuant to Federal Rule of Civil Procedure 56.

## III.    REGULATORY BACKGROUND

*Overview of intercarrier compensation.* Telephone calls often involve multiple service providers. When more than one provider is involved, arrangements must be made for those providers to obtain compensation for their respective roles. The Federal Communications Commission (FCC) oversees and governs this process with regard to telecommunications services that cross state lines. Services that occur entirely within a state are governed by that state's applicable regulatory agency which, in Iowa, is the Iowa Utilities Board (IUB).

Switched access service charges are one form of intercarrier compensation. LECs, such as GLCC, offer switched access services that allow IXCs, such as AT&T, to originate and terminate long distance calls to end users. Thus, for example, if a caller in Iowa places a call to another state, the caller's local phone company (a LEC) accepts the call at a local switch that connects the caller to its network, carries the call over its local network and eventually hands off the call at a switch to the caller's selected long distance company (an IXC). The IXC then carries the call over its national network to a location near the called party's premises and hands it off at a switch to the called party's local telephone company (another LEC). That LEC then routes the call over its local network to a switch that is directly connected to the called party. The call is then connected to the called party.

In this example, the IXC would not be able to carry the long distance call (and, thus, bill its long distance customer) without the assistance of the originating and terminating LECs.  For this reason, those LECs are permitted to assess originating and terminating access charges on the IXC.  The charges are typically established by tariffs, filed by each LEC, or by express contracts between a LEC and an IXC.  They may include separate elements such as "transport" (carrying calls over wires, or "trunks") and "switching" (routing calls in various directions).  Each element is ordinarily priced and billed pursuant to FCC rules and the rates and requirements contained in the applicable tariff or contract.

Under this system, the IXC has no control over the selection of the LEC at either end of the call.  The IXC's long distance service customers make that choice.  Once an IXC's customer chooses to take local service from a particular LEC, the IXC must rely on the customer's chosen LEC to originate calls to the long distance carriers' network.  The same is true with respect to persons called by an IXC's customers.  Those customers choose their own LECs and the IXCs must obtain terminating access services from those LECs when their customers make long distance calls to end users served by those LECs.  If an IXC cannot obtain originating and terminating access services from certain LECs, then that IXC would not be able to serve customers who subscribe to the local telephone services of those LECs.

Switched access service arrangements are often more complicated than suggested by the example discussed above.  For example, a small or rural LEC may not be connected to each IXC's network and, instead, must rely on an intermediate LEC to exchange call traffic with an IXC.  That is, a long distance call directed to a LEC's customer may be handed off by the IXC to a *different* LEC, which then transports the call to the terminating LEC's system.  This means, in short, that there can be more than

three entities involved in carrying a single long distance call. Of course, the additional, intermediary parties also expect compensation for the use of their facilities.

One alternative to basic switched access service is called Centralized Equal Access (CEA). A CEA typically involves multiple LECs working together to build a transport network that accepts long distance calls at a centralized location and then carries them to the individual LECs. In Iowa, a CEA provider known as Iowa Network Services (INS) operates a centralized switch in Des Moines and transports long distance calls between that switch and certain LECs. INS charges an IXC a flat, per-minute rate for each call that is so transported, regardless of the distance the call travels on the INS network.

Another alternative, direct trunking, occurs when an LEC and IXC establish a direct connection at a location where they share a large volume of traffic. When a LEC and an IXC create a direct trunking relationship, calls are exchanged over that connection at an agreed price. When large volumes of traffic are involved, this can be the most cost-effective method of providing intercarrier services.

***Regulation of LEC Switched Access Charges.*** Incumbent local exchange carriers (ILECs) are the traditional local telephone companies that existed prior to the enactment of the Telecommunications Act of 1996. *See, e.g.,* 47 U.S.C. § 251(h); 47 C.F.R. § 61.26(a)(2). Basically, these were the "Baby Bell" companies, or their successors. In Iowa, the ILEC is CenturyLink (formerly known as Qwest). The switched access charges imposed on IXCs by ILECs are highly regulated by the FCC based, at least in part, on each ILEC's actual costs. *See, e.g., In the Matter of Access Charge Reform; Reform of Access Charges Imposed by Competitive Local Exchange Carriers,* 16 FCC Rcd. 9923 (2001) (the *CLEC Access Charge Order*), at ¶ 41.

Competing local exchange carriers (CLECs) are companies that provide local telephone and telecommunications services but are not ILECs. These are companies

formed in the deregulation era to compete with the established ILECs. GLCC is a CLEC. Before 2001, CLECs could file tariffs that unilaterally set the rates they would charge IXCs for interstate switched access services. Those rates could exceed the FCC-approved ILEC rates, sometimes significantly. Thus, an IXC terminating a long distance call with a CLEC may have incurred switched access charges far in excess of the charges that would have resulted if the call terminated with an ILEC.

In 2001, the FCC issued the *CLEC Access Charge Order* and promulgated corresponding regulations. In general, the FCC limited a CLEC's tariffed switched access rate to the rate charged by the ILEC that serves the same geographic area.[1] *Id.* at ¶¶ 51-52. A CLEC could impose a higher rate only by negotiating agreements with individual IXCs. *Id.* at ¶ 87. In addition, the FCC recognized that CLECs serving rural areas face unique cost challenges and, therefore, created a "rural exemption." *Id.* at ¶¶ 64-81. Instead of being limited to the access rates tariffed by the ILEC, a CLEC meeting the FCC's definition of a "rural CLEC" could benchmark its interstate access rates to those tariffed by the National Exchange Carrier Association (NECA). *Id.* at ¶¶ 80-81.

*Access Stimulation*. Some LECs have engaged in a practice referred to as "access stimulation." Typically, this involves a business relationship between a LEC and a provider of high call volume operations (chat lines, adult entertainment calls, free conference calling, etc.). The necessary equipment is installed at or near the LEC's facility, with the incoming calls being received and terminated there. Thus, to terminate these calls, the LEC is not required to incur the expense necessary to deploy and maintain lines and equipment over a broad geographic area, as it would in order to serve residential and business customers.

---

[1] The FCC implemented a three-year phase-in period in lieu of imposing a "flash-cut" that would have immediately reduced a CLEC's switched access charges to those charged by the ILEC. *Id.* at ¶ 52.

This arrangement causes a substantial increase in the number of calls terminated to the LEC, thus allowing the LEC to bill IXCs for switched access services associated with the calls. The LEC and its business partner then share this access revenue. *See, e.g., In the Matter of Connect America Fund; A National Broadband Plan for Our Future*, 26 FCC Rcd. 17663, at ¶¶ 656-57 (2011) (the *Connect America Fund Order*). The FCC has explained:

> Access stimulation schemes work because when LECs enter traffic-inflating revenue-sharing agreements, they are currently not required to reduce their access rates to reflect their increased volume of minutes. The combination of significant increases in switched access traffic with unchanged access rates results in a jump in revenues and thus inflated profits that almost uniformly make the LEC's interstate switched access rates unjust and unreasonable under section 201(b) of the Act.

*Id.* at ¶ 657 [footnote omitted]. The FCC then described the impact of such practices as follows:

> 662. The record confirms the need for prompt Commission action to address the adverse effects of access stimulation and to help ensure that interstate switched access rates remain just and reasonable, as required by section 201(b) of the Act. Commenters agree that the interstate switched access rates being charged by access stimulating LECs do not reflect the volume of traffic associated with access stimulation. As a result, access stimulating LECs realize significant revenue increases and thus inflated profits that almost uniformly make their interstate switched access rates unjust and unreasonable.

> 663. Access stimulation imposes undue costs on consumers, inefficiently diverting capital away from more productive uses such as broadband deployment. When access stimulation occurs in locations that have higher than average access charges, which is the predominant case today, the average per-minute cost of access and thus the average cost of long-distance calling is increased. Because of the rate integration requirements of section 254(g) of the Act, long-distance carriers are prohibited from passing on the higher access costs directly to the customers making the calls to access stimulating entities. Therefore, all

customers of these long-distance providers bear these costs, even though many of them do not use the access stimulator's services, and, in essence, ultimately support businesses designed to take advantage of today's above-cost intercarrier compensation rates.

*Id.* at ¶¶ 662-63.

To address access stimulation, the FCC determined that two conditions must exist for a LEC to be deemed to be engaging in the practice:

The first condition is that the LEC has entered into an access revenue sharing agreement, and we clarify what types of agreements qualify as "revenue sharing." The second condition is met where the LEC either has had a three-to-one interstate terminating-to-originating traffic ratio in a calendar month, or has had a greater than 100 percent increase in interstate originating and/or terminating switched access MOU [minutes of use] in a month compared to the same month in the preceding year.

*Id.* at ¶ 667. The FCC then defined and clarified the meaning of the two conditions. *Id.* at ¶¶ 668-78.

Next, the FCC addressed the consequences of meeting both "access stimulation" conditions. *Id.* at ¶ 679. A CLEC engaging in access stimulation must file a revised tariff in which it benchmarks its access rates "to the rates of the price cap LEC with the lowest interstate switched access rates in the state."[2] *Id.* The FCC noted, however, that this remedy may not always be adequate:

Benchmarking to the lowest price cap LEC interstate switched access rate in the state will reduce rate variance among states and will significantly reduce the rates charged by competitive LECs engaging in access stimulation, even if it does not entirely eliminate the potential for access stimulation. *However, should the traffic volumes of a competitive LEC that meets the access stimulation definition substantially exceed the traffic volumes of the price cap LEC to which it benchmarks, we may reevaluate the appropriateness of the competitive LEC's rates and may evaluate*

---

[2] A "price cap LEC" is a LEC that is subject to the FCC's price capping regulations. Generally, these are the dominant, incumbent LECs. *See, e.g.,* 47 C.F.R. § 61.41.

> *whether any further reductions in rates is warranted.* In addition, we
> believe the reforms we adopt elsewhere in this Order will, over time,
> further reduce intercarrier payments and the incentives for this type of
> arbitrage.

*Id.* at ¶ 690 [emphasis added; footnote omitted].

## IV.    GLCC'S COMPLAINT

GLCC does not deny that it engages in access stimulation. Instead, it alleges
that the *Connect America Fund Order* "specifically permitted LECs to engage in 'access
stimulation.'" Doc. No. 1 at ¶ 24. GLCC further notes, and AT&T agrees, that
before the *Connect America Fund Order* was issued, the parties entered into a
Settlement Agreement and Release (Agreement) that addressed, among other things, the
access rates that AT&T would pay to GLCC. *Id.* ¶ 23; Doc. No. 11 at ¶ 23.

After the *Connect America Fund Order* was issued, GLCC filed a new tariff
that, it contends, complies with the order. That tariff (the Tariff) was filed January 11,
2012, and became effective January 26, 2012. Doc. No. 1 at ¶¶ 1, 24. GLCC
contends that its Agreement with AT&T expired in early 2012 and that, upon the
Agreement's expiration, AT&T's obligation to pay switched access fees to GLCC
became governed by the Tariff.

GLCC alleges that AT&T has refused to pay (a) approximately $400,000 in
interstate access fees due and owing under the Agreement and (b) a substantial amount
of interstate access fees billed pursuant to the Tariff. *Id.* Doc. No. 1 at ¶¶ 30, 35-36.
GLCC contends that the total unpaid balance owing from AT&T is over $4 million. *Id.*
at 37. In its complaint, GLCC asserts claims for breach of contract, collection of
amounts owed pursuant to the Tariff, quantum meruit and unjust enrichment. GLCC
also seeks a declaratory judgment directing AT&T to pay access charges in accordance
with the Tariff in the future.

10

## V.    AT&T'S COUNTERCLAIM

AT&T denies liability, denies that GLCC is entitled to declaratory relief and asserts various affirmative defenses.  Doc. No. 11 at pp. 8-11.  It has also filed a five-count counterclaim prefaced by a lengthy overview of the relevant regulatory history.  *Id.* at 12-43.  AT&T's claims are:

Count I:     Violation of federal tariffs contrary to 47 U.S.C. §§ 201(b) and 203(c)

Count II:    Improper application of Qwest's rates in violation of 47 U.S.C. § 201

Count III:   Unjust and unreasonable practices and unreasonable discrimination in violation of 47 U.S.C. §§ 201(b) and 202(a) with respect to GLCC's transport arrangements

Count IV:    Billing for transport services not provided in violation of 47 U.S.C. § 201(b)

Count V:     Declaratory relief

Doc. No. 11 at pp. 35-43.  I will describe these counts in more detail, as necessary, in the course of analyzing the parties' various arguments.


## VI.    THE MOTION TO DISMISS

In its motion to dismiss, GLCC makes specific attacks on Counts I, II and III of AT&T's counterclaim.  While GLCC does not address Counts IV or V individually, GLCC makes an argument that AT&T lacks standing under the Act to assert any of its claims.  Thus, GLCC seeks dismissal of the entire counterclaim.

## A.    Applicable Standards

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S. Ct. 1955.  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.*  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.*, at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Courts assess "plausibility" by " 'draw[ing] on [their own] judicial experience and common sense.' " *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679).  Also, courts " 'review the plausibility of the

plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n. 4 (8th Cir. 2010)). In determining plausibility, courts may "consider[ ] only the materials that are 'necessarily embraced by the pleadings and exhibits attached to the complaint.'" *Id.* (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n. 4 (8th Cir. 2003)). Courts may also consider "'materials that are part of the public record or do not contradict the complaint.'" *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)).

Finally, while *factual* "plausibility" is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable *legal* theory. *See, e.g., Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Ball v. Famiglio*, 726 F.3d 448, 469 (3d Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Intern., Ltd. v. Lee*, No. 13-cv-3057-MWB, ___ F. Supp. 2d ___, 2014 WL 842893, at *7 (N.D. Iowa Mar. 5, 2014).

### B.    Analysis

#### 1.    Standing

I will address GLCC's standing argument first, as GLCC contends that it impacts AT&T's entire counterclaim. GLCC argues that AT&T has no standing to assert claims under the Act because it has suffered no cognizable injury. Section 207 of the Act authorizes actions only by parties "claiming to be damaged by any common carrier." 47 U.S.C. § 207. GLCC points out that AT&T admits, in its answer, that "it has withheld payment of charges in [GLCC's] bills to the extent that such charges are unlawful." Doc. No. 17-1 at 18 (quoting Doc. No. 11 at ¶¶ 1, 35). According to

GLCC, this means AT&T has suffered no damages and, therefore, has no standing to assert its claims. *Id.* at 18-19 (citing *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 565 (6th Cir. 2007) and *Alliance Commc'ns Coop. v. Global Crossing Telecomms., Inc.*, 663 F. Supp. 2d 807 (D.S.D. 2009)).

AT&T does not dispute GLCC's legal theory. That is, it does not deny that it must have actually paid some of the disputed charges in order to have standing under the Act. Instead, AT&T states that the pleadings show it has, in fact, paid some of those charges. It notes that GLCC's complaint includes an express allegation that AT&T paid GLCC in April 2012 for certain services. Doc. No. 20 at 19 (citing Doc. No. 1 at ¶ 35). It has also submitted a declaration indicting that it paid over $100,000 to GLCC for charges AT&T contends were improperly billed. As such, AT&T argues that it has suffered the requisite injury and therefore has standing to pursue claims under the Act.

Of course, for purposes of GLCC's Rule 12 motion I cannot consider AT&T's supporting declaration. *See, e.g., Whitney*, 700 F.3d at 1128. Nor am I persuaded by AT&T's effort to contradict its own pleading by reference to GLCC's complaint. AT&T's answer expressly states that "it has withheld payment of charges in [GLCC's] bills to the extent that such charges are unlawful." Doc. No. 11 at 8, ¶ 35. AT&T does not allege that it paid *some* unlawful charges, only that it withheld payment "to the extent" that the charges "are unlawful." In other words, according to AT&T's own pleading, when it deemed a charge to be "unlawful," it refused to pay it.

GLCC's complaint does not contain an allegation that AT&T has paid *disputed* charges. In paragraph 35, GLCC simply alleges that AT&T has not paid GLCC for access services "since its last payment in April 2012." Doc. No. 1 at ¶ 35. GLCC does not allege that AT&T's payment in April 2012 constituted payment for charges

AT&T claims to be unlawful.[3]  Indeed, it is impossible to determine, solely from the parties' respective pleadings, which charges were addressed by the April 2012 payment.  Thus, pointing to GLCC's paragraph 35 does not cure AT&T's failure to allege that it has paid any disputed charges (let alone AT&T's affirmative statement that it withheld payment "to the extent" AT&T deems GLCC's charges to be unlawful).

GLCC has correctly identified a significant flaw in AT&T's pleading.  The next question is:  What is the appropriate remedy?  AT&T asks that it be given the chance to amend its pleading, if necessary.  *See* Doc. No. 20 at 19 n.34.  During the hearing, GLCC's counsel acknowledged that it would be appropriate to give AT&T the opportunity to cure the flaw, if possible, with an amended pleading.  I agree that if AT&T is able to allege, in good faith, that it has suffered injury in the form of payment of unlawful charges, it should be permitted to do so.  As such, I will recommend that GLCC's motion to dismiss the counterclaim for lack of standing be **denied without prejudice** and that AT&T be granted leave to file an amended counterclaim to cure its deficient pleading of facts demonstrating injury.  Meanwhile, because AT&T's failure to plead injury appears to be a purely technical deficiency, which AT&T claims it can easily resolve by way of amendment, I will address the remaining arguments raised by GLCC's motion to dismiss.

### 2.    *Counterclaim Count I*

#### a.    *Overview*

In Count I, AT&T alleges that GLCC has billed it for services that are not recoverable pursuant to the Tariff.  It first notes that federal law allows GLCC to bill it

---

[3] Even if paragraph 35 could be deemed to include an allegation by GLCC that AT&T paid a disputed charge, AT&T did not admit this portion of paragraph 35 in its answer.  AT&T admitted only that it withheld payment of GLCC's charges "to the extent that such charges are unlawful."  Doc. No. 11 at 8, ¶ 35.

only for those services described in its tariff. Doc. No. 11 at ¶ 43. It then delves into the various terms and definitions contained in the Tariff alleging, among other things, that GLCC can bill IXCs for switched access services to and from "End Users," meaning customers that purchase interstate or foreign telecommunications service *for a fee*. *Id*. at ¶¶ 44-45, 72. AT&T asserts that if GLCC's conference call customers "are not paying a fee to [GLCC] for an 'interstate or foreign telecommunications service,'" then GLCC is not providing tariffed switched access service to AT&T and, therefore, GLCC may not bill AT&T for that service. *Id*. at ¶¶ 45, 72-73. AT&T further alleges, based on information and belief, that the conference call customers "are not paying a fee to [GLCC] for an interstate or foreign telecommunications service." *Id*. at ¶ 47. Thus, AT&T contends that GLCC's attempts to bill it pursuant to the Tariff constitute an unjust and unreasonable practice. *Id*. at ¶¶ 74-75.

### b. *Summary of the Arguments*

In its motion to dismiss, GLCC construes Count I as presenting a theory that GLCC can bill IXCs under the Tariff only to the extent GLCC provides *tariffed* services to a customer. Doc. No. 17-1 at 6. That is, GLCC interprets Count I to allege that GLCC can bill AT&T for switched access service only when GLCC's customers purchase interstate telecommunications service from GLCC pursuant to a tariff. GLCC then argues that the FCC has never required CLECs to tariff their charges to their own customers. *Id*. at 6-7. Indeed, GLCC states that the FCC has expressly elected *not* to regulate the relationship between CLECs and their customers. According to GLCC, the FCC deems an "End User" to be "any paying customer" of a CLEC. *Id*. at 7. Thus, GLCC argues, so long as its conference call customers are paying a fee to GLCC for interstate services, AT&T and other IXCs are required to pay GLCC's tariffed rates for switched access service. *Id*. at 7-8. Finally, GLCC contends

that AT&T's assertion on information and belief that no fee is being paid is insufficient, as AT&T does not allege facts that make the assertion plausible. *Id.* at 8.

In its resistance, AT&T contends that Count I presents two independent, alternative theories. Doc. No. 20 at 7-11. It first argues that Count I raises a purely factual question as to whether GLCC's conference call customers are paying any fees at all – tariffed or otherwise – for GLCC's services. *Id.* at 7-8. AT&T asserts that for purposes of GLCC's motion to dismiss, this allegation must be accepted as true. *Id.* at 7. And, according to AT&T, if the allegation is true, the conference call customers are not End Users within the meaning of the Tariff and GLCC has no right to bill AT&T for calls terminating to those customers. *Id.* at 7-8. AT&T contends that its "no fee" allegation is plausible in light of GLCC's documented business practices, referencing an IUB finding in 2009 that GLCC's conference calling customers were not End Users because they did not pay for GLCC's services. *Id.* at 8. AT&T further notes that GLCC's financial arrangements are not publicly-available, meaning AT&T cannot, at this stage of the case, provide evidence or make more-specific allegations supporting its "no fee" allegation. *Id.*

AT&T further argues, in the alternative, that even if conference call customers are paying fees to GLCC, the services GLCC provides to those customers are not described in the Tariff. *Id.* at 9-11. AT&T contends that since GLCC elected to file a tariff for interstate telecommunications services, its End Users are only those customers who purchase the services described *in that tariff*. Because the Tariff does not describe any services GLCC provides to its own customers, AT&T argues that those customers cannot be End Users. Thus, whether or not GLCC's customers pay fees to GLCC, AT&T argues that GLCC's attempts to bill AT&T pursuant to the Tariff constitute unjust and unreasonable practices.

In its reply, GLCC accuses AT&T of rewriting Count I. It argues that Count I must stand or fall on AT&T's legal contention that GLCC "is authorized to provide interstate or foreign telecommunications only pursuant to its federal tariff." Doc. No. 24 at 1 (quoting Doc. No. 11 at ¶ 47). It then reiterates its argument that it is entitled to bill AT&T for switched access service pursuant to the Tariff so long as GLCC's customers are paying any fees, not just tariffed fees, for GLCC's services. *Id.* at 2-3. Finally, GLCC again contends that AT&T has failed to allege sufficient facts to support its claim, on information and belief, that GLCC's conference calling customers pay no fees to GLCC. *Id.* at 3.

### c.    *Discussion*

#### i.    *Has AT&T Alleged That No Fees Are Being Paid?*

GLCC contends, in its reply brief, that AT&T has attempted to rewrite Count I to avoid dismissal. GLCC states: "The allegations in AT&T's counterclaims make clear that its assertion that 'the conference calling companies are not paying a fee to [GLCC] for an interstate or foreign telecommunications service' is dependent upon its legal conclusion that '[GLCC] is authorized to provide interstate or foreign telecommunications services only pursuant to its federal tariff.'" Doc. No. 24 at 1. While GLCC may construe Count I in this manner, I do not agree that this is the only possible construction.

As AT&T notes, it has made the following, specific allegation: "Upon information and belief, the conference calling companies are not paying a fee to [GLCC] for an interstate or foreign telecommunications service, and thus [GLCC] has not provided switched access services to AT&T for calls to and from these companies." Doc. No. 11 at ¶ 47. The "[u]pon information and belief" qualification strongly suggests AT&T is making a factual allegation that no fees are being paid - period. If

AT&T intended to concede that some fees are being paid, and rely on the fact that they are not *tariffed* fees, it would not have had to qualify the allegation. There is no dispute that GLCC's customers are not paying fees to GLCC pursuant to a tariff. Indeed, AT&T avers – and GLCC agrees – that the Tariff describes no fees that GLCC may charge to its own customers. If Count I is based solely on a theory that GLCC receives no *tariffed* fees from its customers, there would be no need for AT&T to allege, only on information and belief, that conference call customers are not paying fees to GLCC.

Even after *Twombly*, pleadings are to be construed liberally. *See* Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) ("[Rule] 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'") (quoting *Twombly*, 550 U.S. at 555). When viewed liberally, I find that AT&T's counterclaim does include a factual allegation that GLCC's conference call customers are not paying fees of any kind to GLCC. This does not mean the allegation is plausible (I will address that question next). But the allegation is, at least, there. AT&T is entitled to resist the motion to dismiss Count I by arguing that it has made a plausible allegation that GLCC receives no fees from its conference call customers.

### ii.    Is The Allegation Plausible?

GLCC argues that even if AT&T has actually alleged that no fees are paid, the allegation is not plausible. GLCC notes that AT&T relies on a 2009 decision in which the IUB found that GLCC's conference call customers were not paying for GLCC's services. According to GLCC, this reliance does not give rise to a plausible allegation

because it asks the court to assume GLCC has not changed its business practices in the aftermath of that IUB ruling.  Doc. No. 24 at 2-3.

In reviewing the counterclaim as a whole, however, I note that AT&T's "no fee" allegation is supported by more than a five-year-old IUB ruling.  Throughout its counterclaim, AT&T makes numerous allegations concerning GLCC's business practices, particularly with regard to access stimulation activities.  *See, e.g.,* Doc. No. 11 at ¶¶ 34-40.  AT&T contends the IUB has found GLCC to have engaged in improper conduct, such as providing local access service in areas where GLCC was not authorized to do so and presenting false information to the IUB (either knowingly or due to managerial incompetence).  *Id.* at ¶¶ 38-40.  AT&T's counterclaim incorporates (and includes as an attachment) an IUB ruling issued March 30, 2012, which makes numerous unflattering findings about GLCC, its practices and its management.  *See* Doc. No. 11-1.[4]  AT&T then alleges, on information and belief, that "conference calling companies are not paying a fee to Great Lakes for an interstate or foreign telecommunications service."  Doc. No. 11 at ¶ 47.

In deciding plausibility, courts must employ "judicial experience" and "common sense."  *Whitney*, 700 F.3d at 1128.  A claim has facial plausibility when the pleading contains factual content that allows the court to draw the reasonable inference that the defending party is liable for the misconduct alleged.  *Twombly,* 550 U.S. at 556.  In light of GLCC's operational track record, at least as it is portrayed by AT&T's allegations and the prior IUB's rulings, I find AT&T's "no fee" allegation to be clearly plausible.  GLCC has failed to collect fees from its conference call customers in the

---

[4] Neither party argues that it is improper for me to consider this IUB ruling, or other rulings referenced by the parties, for purposes of GLCC's motion to dismiss.  As noted above, in deciding a Rule 12(b)(6) motion courts may consider materials attached to the pleadings and materials that are part of the public record.  *Whitney*, 700 F.3d at 1128; *Miller*, 688 F.3d at 931.

past, has made false statements about its business practices and, indeed, has been criticized by the IUB for not changing its business practices even after being directed to do so. For example, in its 2012 order the IUB found GLCC's "claim to have been offering service in the Lake Park exchange was false." Doc. No. 11-1 at 12-13. The IUB characterized various GLCC representations as "untrue," "false" and "not credible." *See, e.g. id*. at 14, 20-21. The IUB also noted that GLCC had not changed certain practices between 2009 and 2012 despite being directed to do so in the 2009 order. *Id*. at 23-24.

In short, in accepting AT&T's factual allegations as true and in taking the IUB's prior findings at face value, it is not sheer speculation for AT&T to allege, on information and belief, that GLCC *still* does not collect fees from its conference call customers. Put another way, at this stage of the case AT&T has made sufficient factual allegations to allow a reasonable inference that GLCC is acting in that manner. Of course, whether or not this is actually true is an issue for another day. For purposes of GLCC's motion to dismiss, however, AT&T has plead sufficient facts to put at issue whether GLCC's customers paid fees to GLCC in connection with the switched access service charges that GLCC has billed to AT&T.

If no fees were paid, then those customers are not End Users within the meaning of the Tariff. The Tariff contains a definition of "End User" that states, *inter alia*: "An End User must pay a fee to the Company for telecommunications services." Doc. No. 17-3 at 11. GLCC does not contend otherwise and, indeed, takes the position that an "End User" is "any paying customer." Doc. No. 17-1 at 7.

If GLCC's conference call customers are not End Users, then AT&T is not a Buyer, as the Tariff defines "Buyer" as an IXC "utilizing the Company's Access Service to complete a Call *to or from End Users*." Doc. No. 17-3 at 10 [emphasis added]. The Tariff further defines "Access Charge" as a charge "assessed to the Buyer

through which the Company is compensated for providing Access." *Id.* Based on these definitions, if GLCC's conference call customers are not End Users, then AT&T is not a Buyer with regard to calls terminated to those customers and any charges billed to AT&T by GLCC would not be authorized by the Tariff.

Because AT&T plausibly alleges that GLCC's customers are not paying fees, AT&T is entitled to conduct discovery to explore the accuracy of that allegation. If it is true, then AT&T has almost certainly been overbilled since the Tariff took effect. For this reason, I will recommend that GLCC's motion to dismiss be **denied** with regard to Count I of AT&T's counterclaim.

Denying GLCC's motion to dismiss Count I for this reason renders it unnecessary, at this time, to resolve AT&T's alternative, legal argument that a customer must pay *tariffed* fees in order to be an End User. If discovery reveals that no fees are being paid, this issue will be moot. If fees of some kind are being paid, the issue can be revisited at a later stage of the case.[5]

### 3. *Counterclaim Count II*

#### a. *Overview*

In Count II, AT&T complains that GLCC's interstate switched access rates, as reflected in the Tariff, are so high as to be unjust and unreasonable in violation of 47 U.S.C. § 201(b). Doc. No. 11 at ¶¶ 51-56, 78-83. AT&T notes that GLCC has adopted Qwest's rates, as required by the *Connect America Fund Order*, but alleges that

---

[5] Whether GLCC's conference call customers are paying fees to GLCC may not be a simple "yes or no" question. During the hearing, there was some definitional discussion concerning the concept of a "fee." AT&T suggested, for example, that even the payment of some kind of fee would not turn a GLCC customer into an End User if that fee is ultimately rebated to the customer, through revenue sharing or otherwise. There is no need to take up this issue in the abstract. The question of whether GLCC's customers are paying fees such that they qualify as End Users is best resolved after the factual record has been developed.

those rates are nonetheless too high because GLCC's cost structure is not comparable to Qwest's. *Id.* at ¶¶ 52-54, 79-80. AT&T further alleges that GLCC's charges for interstate switched access far exceed its charges for *intra*state switched access thus, according to AT&T, demonstrating that the rates set forth in the Tariff are unjust and unreasonable.

### b. Summary of the Arguments

In its motion to dismiss, GLCC contends that Count II must be dismissed pursuant to the filed tariff doctrine (also sometimes referred to as the filed rate doctrine). Doc. No. 17-1 at 9-10. GLCC asserts that AT&T is making an improper collateral attack on a lawfully-filed tariff and contends that the FCC, not the federal courts, must determine the reasonableness of its rates. *Id.* at 10-12.

In its resistance, AT&T argues that even if the filed tariff doctrine bars its claim for damages, it is entitled to seek *prospective* relief from an allegedly-unlawful tariff. Doc. No. 20 at 11-12. It contends that it has the option of challenging the reasonableness of the Tariff in federal court or at the FCC, but not both. *Id.* at 12. It further argues that while the federal courts may not be in a position to establish new, reasonable rates, those courts are empowered to strike down unreasonable tariffs. According to AT&T, such an outcome would require GLCC to file a new tariff, the reasonableness of which could then be litigated at the FCC. *Id.* at 12-13. Finally, AT&T notes that the court could refer Count II to the FCC under the primary jurisdiction doctrine as opposed to dismissing it outright.

In reply, GLCC disputes AT&T's contention that federal courts may review the reasonableness of tariffs filed with the FCC. Doc. No. 24 at 4. GLCC contends that only the FCC itself may investigate and prescribe prospective changes to a carrier's tariff. *Id.*

### c.    Discussion

As plead by AT&T, Count II demands damages, interest and other forms of relief based on AT&T's claim that the rates set forth in the Tariff are unjust and unreasonable.  *See* Doc. No. 11 at ¶¶ 82-83.  In response to GLCC's motion to dismiss, AT&T now admits that it is entitled, at most, to prospective relief in the form of an order that would, in effect, strike the Tariff.  Doc. No. 20 at 12-13.  AT&T no longer contends that it would be entitled to damages for the period of time between the tariff's effective date and the date of the order it requests.

AT&T's rather sharp retreat illustrates that Count II was ill-conceived and poorly drafted.  The filed tariff doctrine prevents a court from awarding any form of relief that would have the effect of imposing rates other than those reflected in a duly-filed tariff.  *See, e.g., Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 680-81 (8th Cir. 2009) (rejecting fraud and promissory estoppel claims brought by customer seeking to enforce an allegedly-promised discount).  In *Firstcom*, the court explained the doctrine as follows:

> The filed rate doctrine "forbids a regulated entity [from charging] rates for its services other than those properly filed with the appropriate federal regulatory authority." The filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue.

*Id.* at 679 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir.), *cert. denied*, 504 U.S. 957 (1992)).  Yet Count II plainly asks the court to (a) decide that the rates reflected in the Tariff are too high, (b) determine a just and reasonable rate and (c) award damages to AT&T to the extent that any charges it may have paid pursuant to the Tariff exceed the court-established, just and reasonable charges.  Doc. No. 11 at ¶¶ 77-83.  As plead, Count II plainly violates the filed tariff doctrine.  To the extent Count II seeks any form of relief for any period of time during which the Tariff is lawfully in

effect, it must be dismissed. Not stayed, referred to the FCC or otherwise kept on some form of judicial life support, but simply dismissed. The filed tariff doctrine compels that result. *See Crumley v. Time Warner Cable, Inc.*, 556 F.3d 879, 881-82 (8th Cir. 2009) (affirming dismissal of customer's claims against a cable television provider).

As for prospective relief, AT&T is correct that the filed tariff doctrine does not preclude all legal challenges to a tariff. The FCC has stated:

> [T]he Filed Rate Doctrine does not insulate tariffs from legal challenge. As we have previously stated, "it is well established that the rates and practices carriers seek to shelter pursuant to the Filed Rate Doctrine are always subject to an inquiry into their reasonableness." Where, as here, the Commission determines that a tariff violates [47 U.S.C. §] 201(b), the Filed Rate Doctrine is no defense.

*In re Bell Atlantic-Delaware, Inc.*, 15 FCC Rcd. 20665, ¶ 20 (2000) [footnotes omitted]. The question remains, however, whether this court is the correct forum for AT&T's challenge. AT&T notes that the federal district courts have subject matter jurisdiction over claims that challenge practices as allegedly being unjust or unreasonable. Doc. No. 20 at 12 (citing 47 U.S.C. §§ 206-208). GLCC does not argue otherwise. However, AT&T's challenge to the rates set forth in the Tariff invokes the primary jurisdiction doctrine, which "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63 (1956). The Eighth Circuit Court of Appeals has explained:

> Primary jurisdiction is a common-law doctrine that is utilized to coordinate judicial and administrative decision making. *See Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988). The doctrine allows a district court to refer a matter to the appropriate administrative agency for a ruling in the first instance, even when the matter is initially cognizable by the district court. *See Iowa Beef Processors, Inc. v. Illinois Cent. Gulf R.R. Co.*, 685 F.2d 255, 259 (8th

Cir. 1982). There exists no fixed formula for determining whether to apply the doctrine of primary jurisdiction. See *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Rather, in each case we consider whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes for which the doctrine was created. *See United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir. 1984). We are always reluctant, however, to invoke the doctrine because added expense and undue delay may result. *See id.*

One reason courts apply the doctrine of primary jurisdiction is to obtain the benefit of an agency's expertise and experience. The principle is firmly established that "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). In fact, agency expertise is the most common reason for applying the doctrine. *See Barlow*, 846 F.2d at 476. Another reason is to promote uniformity and consistency within the particular field of regulation. *See Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976).

*Access Telecomms. v. Sw. Bell Tel. Co.*, 137 F.3d 605, 608 (8th Cir. 1998).

AT&T's claim for prospective relief in Count II presents a textbook scenario for invoking primary jurisdiction. The FCC issued the *Connect America Fund Order* after undertaking an extensive investigative process:

There has been enormous interest in and public participation in our data-driven reform process. We have received over 2,700 comments, reply comments, and ex parte filings totaling over 26,000 pages, including hundreds of financial filings from telephone companies of all sizes, including numerous small carriers that operate in the most rural parts of the nation. We have held over 400 meetings with a broad cross-section of industry and consumer advocates. We held three open, public workshops, and engaged with other federal, state, Tribal, and local officials throughout the process.

*See Connect America Fund Order* at ¶ 12 [footnote omitted].  As discussed earlier, one outcome of that lengthy process was a determination by the FCC that the switched access rates of access-stimulating CLECs should be benchmarked "to the rates of the price cap LEC with the lowest interstate switched access rates in the state."  *Id.* at ¶ 679.  Moreover, the FCC reserved the right to demand *even lower* rates under certain circumstances:

> [S]hould the traffic volumes of a competitive LEC that meets the access stimulation definition substantially exceed the traffic volumes of the price cap LEC to which it benchmarks, we may reevaluate the appropriateness of the competitive LEC's rates and may evaluate whether any further reductions in rates is warranted.

*Id.* at ¶ 690.

Here, there is no dispute that GLCC complied with the *Order*'s "benchmark" requirement by filing the Tariff.  AT&T claims, however, that GLCC's rates are still too high and that the FCC-created exception should apply.  That is, the exception in which the FCC indicated that "we may reevaluate" a CLEC's rates and "evaluate whether any further reductions in rates is warranted."  *Id.* [emphasis added].  Having enacted a benchmarking framework subject to an exception when an access-stimulating CLEC's volumes "substantially exceed" those of the benchmarked LEC, the FCC is clearly the correct entity to determine when that exception may apply.  Moreover, when the exception does apply, the FCC – as opposed to a federal district court – is in the best position to determine the appropriate rate reduction.

In short, the interests of agency expertise, consistency and uniformity compel a finding that the FCC has primary jurisdiction over AT&T's claim that GLCC's switched access rates, while benchmarked as required by the *Connect America Fund Order*, are nonetheless unreasonable under the circumstances.  When primary jurisdiction applies, a federal court may either stay or dismiss a claim in favor of the

appropriate agency. *United States v. Henderson*, 416 F.3d 686, 691 (8th Cir. 2005) (citing *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1456 (8th Cir. 1995)). Given AT&T's concession that any relief it might be entitled to obtain pursuant to Count II would be purely prospective, there is no need to delay the other claims in this lawsuit while AT&T litigates its "unreasonable rate" claim at the FCC. Instead, I recommend that Count II be **dismissed without prejudice** pursuant to the primary jurisdiction doctrine.

### 4. *Counterclaim Count III*

#### a. *Overview*

In Count III, AT&T seeks relief from GLCC's alleged refusal to negotiate a direct interconnection between GLCC's and AT&T's facilities. AT&T contends that it has a direct trunking arrangement with another LEC (Qwest) and has attempted to negotiate such an arrangement with GLCC, but GLCC has refused. Doc. No. 11 at ¶¶ 57, 88-89. AT&T further contends (a) that such an arrangement would dramatically reduce its transportation charges regarding GLCC's traffic and (b) that GLCC has established a direct trunking relationship with at least one other (unnamed) carrier. *Id.* at ¶¶ 60, 62, 86-89. According to AT&T, GLCC's refusal to negotiate is an unjust and unreasonable practice, in violation of 47 U.S.C. § 201(b), and amounts to unreasonable discrimination in violation of 47 U.S.C. § 202(a).

#### b. *Summary of the Arguments*

In its motion to dismiss, GLCC argues (a) AT&T has no private right of action to bring this claim, under either Section 201(b) or Section 202(a), and (b) AT&T has not plead sufficient facts to support a claim under Section 202(a). Doc. No. 17-1 at 13-

18.  GLCC further argues that CLECs have no legal duty to directly connect their networks to those of other carriers.  *Id.* at 13-14.

In its resistance, AT&T argues that it does, in fact, have the right to bring suit to seek relief from practices that violate Section 201(b) or Section 202(a) and, further, that it has properly plead such a claim.  Doc. No. 20 at 13-14.  AT&T cites to cases and FCC rulings in support of its contention that a common carrier may challenge allegedly-unreasonable practices in federal court.  *Id.* at 14-16.  AT&T further contends that it has plead facts sufficient to state a claim for unlawful discrimination under Section 202(a).  *Id.* at 17-18.  In the alternative, AT&T suggests that this court may refer Count III to the FCC for its consideration under the primary jurisdiction doctrine. *Id.* at 15-16.

In reply, GLCC again notes that it has no duty to enter into a direct connection arrangement with AT&T and contends that this court is not the proper forum for AT&T's complaint.  GLCC argues that Count III should be dismissed without prejudice and that AT&T should then, if it so chooses, present the issue to the FCC.


### c.    *Discussion*

As previously noted, AT&T brings Count III pursuant to Sections 201(b) and 202(a) of the Act.  Section 201(b) declares that it is unlawful for any common carrier to engage in any "unjust or unreasonable" practice.  47 U.S.C. § 201(b).  Section 202(a) forbids "any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services."  47 U.S.C. § 202(a).  AT&T claims that GLCC's alleged refusal to establish a direct connection violates both statutes.

After careful review of the parties' arguments, I conclude that Count III, like Count II, should be referred to the FCC pursuant to the primary jurisdiction doctrine. In reaching this conclusion, I adopt the reasoning – but not the ultimate conclusion – of

the Ninth Circuit Court of Appeals in *North Cnty. Commc'ns Corp. v. California Catalog & Tech.*, 594 F.3d 1149 (9th Cir. 2010). In that case, a CLEC filed suit under Section 201(b) to enforce various compensation arrangements with a commercial mobile radio service (CMRS) provider. *Id.* at 1151-52. In considering whether the plaintiff had a private right of action to enforce Section 201(b), the Ninth Circuit Court of Appeals stated that while Section 201(b) is broadly-worded, "a more reasonable interpretation is that it is within the [FCC]'s purview to determine whether a particular practice constitutes a violation for which there is a private right to compensation." *Id.* at 1158. The court explained:

> North County essentially requests that the federal courts fill in the analytical gap stemming from the absence of a [FCC] determination regarding § 201(b). This we decline to do. The district court properly dismissed North County's declaratory judgment claim premised on § 201(b), because entry of a declaratory judgment "would ... put interpretation of a finely-tuned regulatory scheme squarely in the hands of private parties and some 700 federal district judges, instead of in the hands of the [FCC]."

*Id.* (quoting *Greene v. Sprint Commc'ns Co.*, 340 F.3d 1047, 1053 (9th Cir. 2003), which, in turn, quoted *Conboy v. AT & T Corp.*, 241 F.3d 242, 253 (2d Cir. 2001)). The court then noted that the FCC "has not determined that the CMRS providers' lack of payment to CLECs . . . violates § 201(b)." *Id.* at 1158. For that reason, the court affirmed the district court's dismissal of the CLEC's claim, holding that a private party has no right of action under the Act to seek relief from an allegedly unjust or unreasonable practice unless the FCC has already found that practice to be unjust or unreasonable. *Id.* at 1160-61.

In reaching this holding, the Ninth Circuit found support in *Global Crossing Telecomms. v. Metrophones Telecomms.*, 550 U.S. 45 (2007). There, a payphone service provider (PSP) sued an IXC to recover compensation required by FCC

regulations. *Id.* at 47. The FCC had already declared that an IXC's refusal to pay the required compensation was an unjust or unreasonable practice in violation of Section 201(b). *Id.* In light of this regulatory determination by the FCC, the *Global Crossing* majority held that the PSP had a private right of action, pursuant to Section 207, to sue for damages resulting from that unjust or unreasonable practice. *Id.* at 54-55.

The *North County* court stated: "In contrast to the facts in *Global Crossing*, the [FCC] has not made any findings that CMRS providers' failure to compensate CLECs constitutes an unreasonable practice in violation of § 201(b)." 594 F.3d at 1160. While that is clearly true, the *Global Crossing* court did not go so far as to hold that a private cause of action to enforce Section 201(b) can never arise in the absence of a prior FCC determination that the challenged practice is unjust or unreasonable. As AT&T notes, the FCC itself does not appear to take this position. *See* Doc. No. 20 at 15-16 (citing *AT&T Corp. v. All American Tel. Co.*, 28 FCC Rcd. 3477, ¶ 29 & n.127 (2013), and *AT&T Corp. v. Alpine Commc'ns*, 27 FCC Rcd. 11511, ¶ 41 (2012), *recon. denied*, 27 FCC Rcd. 16606 (2012)).[6] Nor is there binding Eighth Circuit Court of Appeals authority, or significant nonbinding authority from other jurisdictions, akin to *North County*.[7]

In short, it is at least arguable that the *North County* court went too far in holding that there can never be a private right of action to challenge a practice under Section 201(b) unless the FCC has already declared the practice to be unjust or

---

[6] In *Alpine*, the FCC found that AT&T's claim had been "properly brought" in federal court before being referred under the primary jurisdiction doctrine. 27 FCC Rcd. 11511, at ¶ 41.

[7] The Third Circuit Court of Appeals has cited *North County* favorably. *See Hoffman v. Rashid,* 388 F. App'x 121, 123 (3d Cir. 2010) (per curiam); *see also Havens v. Mobex Network Servs., LLC,* Civ. No. 11-993 (KSH), 2012 WL 3600291, at *7 (D.N.J. Aug. 20, 2012) (citing *North County* favorably but noting that it represents a "particularly stringent view").

unreasonable. I need not reach that issue, however, because – for the same policy reasons expressed in *North County* – I conclude that Count III should be referred to the FCC under the primary jurisdiction doctrine. AT&T argues that it is unjust or unreasonable for GLCC to refuse to establish a direct connection, either because (a) the volume of traffic generated by GLCC's access-stimulation practices renders GLCC's decision unjust or unreasonable (the Section 201(b) theory) or (b) GLCC has allegedly established a direct connection with another IXC (the Section 202(a) theory). Congress, however, has elected to require only that telecommunications carriers establish direct or indirect connections with each other. *See* 47 U.S.C. § 251(a).[8] If there are to be circumstances under which a direct connection is the only just and reasonable option, those circumstances should be determined by the FCC, not by the various federal courts.

As with Count II, the interests of agency expertise, consistency and uniformity compel a finding that the FCC has primary jurisdiction over AT&T's claim that GLCC's alleged refusal to establish a direct connection is unjust or unreasonable. And, as with Count II, I find that there is no reason to stay or delay this case pending the FCC's consideration of that claim. GLCC commenced this action to collect billed amounts allegedly owed by AT&T. While Counts I and IV of AT&T's counterclaim raise issues that could directly impact GLCC's right to payment of its invoices, Counts II and III do not. There is no reason to put GLCC's claims on hold while the FCC considers the issues raised in Counts II and III. As with Count II, I recommend that Count III be **dismissed without prejudice** pursuant to the primary jurisdiction doctrine.

---

[8] "Each telecommunications carrier has the duty — (1) to interconnect *directly or indirectly* with the facilities and equipment of other telecommunications carriers . . . ." 47 U.S.C. § 251(a)(1) [emphasis added].

## VII.    THE MOTION FOR SUMMARY JUDGMENT

GLCC seeks entry of summary judgment in its favor on the issue of AT&T's liability, arguing that AT&T no longer has the right to dispute invoices issued by GLCC because AT&T failed to comply with dispute resolution provisions set forth in the Tariff.

### A.    Applicable Standards

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "'might affect the outcome of the suit under the governing law.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the substantive law will identify which facts are material."  *Id*.  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not.  *Id*.

"An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).  Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

33

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49 (citation and internal quotation marks omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## B.    Undisputed Facts

Except as otherwise noted, the following facts are undisputed for purposes of GLCC's motion for summary judgment on liability:

*The Tariff.*    The Tariff was filed with the FCC on January 11, 2012, and became effective January 26, 2012, pursuant to 47 U.S.C. § 204(a)(3).    It includes the following billing dispute provision:

3.1.7  Billing Disputes

      3.1.7.1        General

           (a)      All bills are presumed accurate, and shall be binding on the Buyer unless written notice of a good faith dispute is received by the Company. For the purposes of this Section, "notice of a good faith dispute" is defined as written notice to the Company's contact (which is listed on every page of this Tariff) within a reasonable period of time after the invoice has been issued, containing sufficient documentation to investigate the dispute, including the account number under which the bill has been rendered, the date of the bill, and the specific items on the bill being disputed. A separate letter of dispute must be submitted for each and every individual bill that the Buyer wishes to dispute.

           (b)      Prior to or at the time of submitting a good faith dispute, Buyer shall tender payment for any undisputed amounts, as well as payment for any disputed charges relating to traffic in which the Buyer transmitted an interstate telecommunications to the Company's network.

Doc. No. 17-3 at 43.

*The Communication.* On May 2, 2012, Candie Nelson received the following email from an AT&T representative:

> Dear Ms. Nelson:
>
> This letter is intended to formally notify Great Lakes Communication Corp. that AT&T Corp. disputes the validity of the switched access invoice billed by Great Lakes to AT&T Corp. on April 1, 2012 and will withhold the full amount invoiced. AT&T Corp. disputes the invoice and withholds payment for the following reasons:
>
> 1) Great Lakes has billed AT&T Corp. for terminating access services to Spencer, Iowa but is not certificated to provide local exchange service in that exchange.
>
> 2) Great Lakes invoiced charges are based on a distance of 133 miles when mileage should be no more than 1 mile.
>
> 3) Great Lakes has billed for 2 tandem switched terminations when Great Lakes should bill only 1 termination.
>
> 4) Great Lakes included a $408,222.49 back-bill on the invoice for which it has not provided an explanation.
>
> AT&T Corp. will continue to withhold payment on future invoices until these concerns are addressed appropriately. Please contact me at 816-995-4528 if you would like to discuss these issues.

Doc. No. 17-3 at 65. Ms. Nelson forwarded the email to Josh Nelson, the Company contact listed on the Tariff, within the hour. *Id.* Mr. Nelson responded to AT&T by email on May 4, 2012, stating that the dispute notice was defective because it failed to comply with the requirements of 3.1.7.1(a) and (b) of the Tariff. Doc No. 17-3 at 67-

68.  Nelson denied AT&T's claims in items 1 through 3, but acknowledged there had been a billing error regarding item 4 and credited the account.  GLCC requested prompt payment for the remainder of the invoiced changes.  AT&T contends it then paid GLCC's invoice for March 2012, in the amount of $100,203.  GLCC acknowledges that AT&T made a payment of $100,203 on April 2, 2012, but does not agree it was for the March 2012 invoice.

### C.   *Summary of the Arguments*

GLCC argues it is entitled to partial summary judgment on liability because AT&T failed to comply with the Tariff's billing dispute requirements.  Specifically, it contends AT&T did not provide proper written notice of a good faith dispute and did not tender payment for the disputed charges.  GLCC argues that strict compliance with Tariff provisions is required and, therefore, that AT&T has waived the right to dispute GLCC's invoices.

AT&T reiterates its arguments concerning Count I of its counterclaim to contend that it is not a Buyer, as defined by the Tariff, and therefore is not subject to the Tariff's billing dispute requirements.  Moreover, while AT&T agrees that it has not strictly complied with the Tariff's notice requirements, it contends that its email message of May 2, 2012, was sufficient to preserve its right to dispute GLCC's charges.  Finally, AT&T argues that the FCC has previously declared a tariff's advance-payment requirement to be unreasonable and, therefore, that AT&T was not required to issue payment to GLCC as a condition of disputing GLCC's charges.

### D.   Discussion

#### 1.   Is There a Genuine Issue of Material Fact as to Whether AT&T is a Buyer Under the Tariff and, Therefore, Subject to its Billing Dispute Requirements?

As discussed in Section VI(B)(2), *supra*, AT&T has stated a plausible claim in Count I that GLCC has breached the Tariff by billing AT&T for services not described in the Tariff.   GLCC can only provide "Switched Access Services"[9] to a Buyer, which is an IXC that uses GLCC's services to complete calls to and from End Users.   An "End User" is:

> [A]ny Customer of an Interstate or Foreign Telecommunications Service that is not a carrier, except that a carrier other than a telephone company shall be deemed to be an "End User" when such carrier uses a Telecommunications service for administrative purposes and a person or entity that offers Telecommunications services exclusively as a reseller shall be deemed to be an "End User" if all resale transmissions offered by such reseller originate on the premises of such reseller.   *An End User must pay a fee to the Company for telecommunications service.*   Other carriers including IXCs, are not considered to be End Users under the terms of this Tariff, unless the Company consents to such classification in writing.

Doc. No. 17-3 at 11 [emphasis added].   AT&T alleges GLCC has breached its Tariff because its End Users do not pay a fee to GLCC.   If that is the case, AT&T is not a Buyer.

As the moving party, GLCC bears the initial burden of showing there are no genuine issues concerning any facts GLCC must establish to recover, including the fact that AT&T is a Buyer pursuant to the Tariff.   *Hartnagel*, 953 F.2d at 395.   To meet this burden, a movant must file a statement of undisputed facts "setting forth each

---

[9] Switched Access Service is defined as "Access to the Network of the Company for the purpose of receiving or delivering Calls."   Doc. No. 17-3 at 12.

material fact as to which the moving party contends there is no genuine issue to be tried." Local Rule 56(a)(3). GLCC's statement of undisputed facts does not allege that AT&T is a Buyer, nor does it allege that GLCC's customers paid fees to GLCC regarding the services for which GLCC has billed AT&T. *See* Doc. No. 17-2. Thus, GLCC's statement does not demonstrate that GLCC is entitled to judgment as a matter of law.

GLCC did, however, submit an affidavit from Mr. Nelson that includes the following sentence: "GLCC requires each of its end users to pay a fee for telecommunications service." Doc. No. 17-3 at ¶ 6. GLCC has submitted no other evidence supporting this carefully-worded comment. Simply stating that GLCC "requires" its end users to pay a fee does not establish, as a matter of law, that such a fee was *actually paid* with regard to the specific services for which GLCC seeks to recover payment from AT&T. The conclusory, one-sentence statement in Mr. Nelson's affidavit does not come close to establishing that there is no genuine dispute of material fact concerning AT&T's status as a Buyer.

Even if Mr. Nelson's affidavit satisfied GLCC's initial burden as the summary judgment movant, I further find – for reasons discussed earlier – that AT&T has shown that there are grounds supporting a genuine dispute of GLCC's allegation. AT&T points to prior IUB rulings containing findings (a) that GLCC did not collect fees from its end-user customers (as of 2009), (b) that GLCC did not change certain business practices between 2009 and 2012 despite being directed to do so in 2009 and (c) that GLCC made various false or incorrect representations to the IUB. *See Qwest Commc'ns v. Superior Tel. Coop.*, Docket No. FCU-07-2, 2009 WL 3052208, (Iowa U.B. Sept. 21, 2009), *recon granted in part*, 2009 WL 4571832 (Iowa U.B. Dec. 3, 2009), *further recon denied*, 2011 WL 459685 (Iowa U.B. Feb. 4, 2011), *aff'd*, *Farmers & Merchants Mut. Tel. Co. of Wayland v. Iowa Utilities Bd.*, 829 N.W.2d 190

(Iowa Ct. App. 2013); *In re Great Lakes Commc'ns*, Docket No. SPU-2011-0004, 2012 WL 1132952, at *14 (Iowa U. B. Mar. 30, 2012).[10] It is quite possible, as GLCC claims, that GLCC has changed its practices and has collected fees from all of its customers since the Tariff took effect. However, the record does not reflect that this is true as a matter of law.

AT&T is entitled to conduct discovery to determine whether it is actually a Buyer, as defined by the Tariff, with regard to the services at issue. If AT&T is not a Buyer, then the Tariff does not apply. As such, I recommend that GLCC's motion for summary judgment be **denied** on this basis. While this recommendation, if adopted, would resolve GLCC's motion for summary judgment, because this is a Report and Recommendation I will address the remaining issues raised by that motion.

### 2. If AT&T is a Buyer, is GLCC Entitled to Summary Judgment Based on AT&T's Failure To Comply With the Tariff's Billing Dispute Requirements?

As a common carrier, GLCC is required to file a tariff, "showing all charges . . . and showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203. A tariff can become substantively lawful in two ways – it can be declared lawful in a hearing before the FCC or it can be "deemed lawful" through the streamlined manner pursuant to 47 U.S.C. § 204(a)(3). *Virgin Islands Tel. Corp. v. FCC*, 444 F.3d 666, 669 (D.C. Cir. 2006). Under the filed rate doctrine, once a tariff obtains lawful status through one of the two means described above, it is considered to be "the law" and therefore "'conclusively and exclusively enumerate[s] the rights and

---

[10] Just as a court may take judicial notice of public record materials in considering a motion to dismiss pursuant to Rule 12(b)(6), so too may a court consider those materials in considering a motion for summary judgment. *See, e.g., Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680, 685 n.6 (8th Cir. 2011).

liabilities' as between the carrier and the customer." *Sancom, Inc. v. Qwest Commc'ns Corp.*, 643 F. Supp. 2d 1117, 1124 (D.S.D. 2009) (quoting *Iowa Network Servs., Inc. v. Qwest Corp.*, 466 F.3d 1091, 1097 (8th Cir. 2006)). "'The terms of a tariff should be given their ordinary meaning, and strained or unnatural constructions are not permitted.'" *Iowa Network Servs., Inc. v. Qwest Corp.*, 385 F. Supp. 2d 850, 895 (S.D. Iowa 2005) (quoting *BellSouth Telecomms., Inc. v. Kerrigan*, 55 F. Supp. 2d 1314, 1324 (N.D. Fla. 1999)).

Here, GLCC argues that because the Tariff obtained "deemed lawful" status on January 26, 2012, AT&T was bound to comply with all of its provisions after that date, including its dispute resolution provisions. GLCC contends that AT&T has waived the right to dispute charges billed by GLCC under the Tariff because AT&T violated the Tariff's notice and payment requirements. As such, GLCC contends that it is entitled to summary judgment on the issue of AT&T's liability for those billed charges.

### a. *Notice Requirements*

As noted above, the Tariff imposes numerous requirements concerning the form and substance of any notice concerning a disputed charge. The notice must be submitted to a particular person, must be sent "within a reasonable period of time after the invoice has been issued," and must contain "sufficient documentation to investigate the dispute." Doc. No. 17-3 at 43. Moreover, "a separate letter of dispute must be submitted for each and every individual bill that the Buyer wishes to dispute." *Id.* There is no dispute that AT&T did not strictly comply with these requirements. It sent a single email to someone other than the specified person at GLCC, referenced only one invoice and, instead of sending a new notice after each subsequent invoice, simply stated that it would dispute all future invoices until the issues raised in its notice were

resolved. *Id.* at 65. The question is whether these deficiencies compel entry of judgment in GLCC's favor as a matter of law.

GLCC points out that courts have strictly construed tariff notice provisions. *See Powers Law Offices, P.C. v. Cable & Wireless USA, Inc.*, 326 F. Supp. 2d 190, 193 (D. Mass. 2004) (citing cases and noting that unless plaintiffs complied with notice provision they "are deemed to admit the accuracy of the entire contents of the bills at issue and are foreclosed from any opportunity to challenge the accuracy of those bills."). Thus, according to GLCC, the lack of strict compliance constitutes a waiver of AT&T's right to dispute GLCC's invoices.

While AT&T denies that the Tariff applies to GLCC's charges, it further argues that under the circumstances present here, its email message substantially complied with the Tariff's notice requirements. It also argues that GLCC has not been damaged by any noncompliance.

On this issue, AT&T has the better argument. None of the cases cited by GLCC address the current situation, in which written notice was undoubtedly provided and expressly stated that the issues raised in that notice apply prospectively to future invoices. Instead, those cases involved the complete lack of *any* written notice concerning the matters in dispute within the period of time specified by tariff. *See Powers Law Offices*, 326 F. Supp. 2d at 193-94 (dismissing claims for which no notice was provided within the tariff's 45-day notice period); *MCI Telecomm. Corp. v. Best Tel. Co.*, 898 F. Supp. 868, 874–75 (S.D. Fla. 1994) (no notice provided); *MCI Telecomm. Corp. v. Ameri–Tel, Inc.*, 852 F. Supp. 659, 666 n.5 (N.D. Ill. 1994) (phone call is not sufficient when written notice is required); *MCI Telecomm. Corp. v. Premium Mktg. Sys.*, No. 91 C 4048, 1992 WL 6693, at *2 (N.D. Ill. Jan. 15, 1992) (no notice provided). GLCC cites no case addressing the issue of whether a written

notice that is actually given, and that expressly states that the issues raised in the notice apply prospectively to future invoices, is sufficient to preserve those issues.

Moreover, as AT&T points out, the cases GLCC relies on do not address the fact that Congress has created a two-year statute of limitations for the recovery of overcharges. Doc. No. 20 at 20 (citing 47 U.S.C. § 415[11]). While a tariff generally has the force of law, it cannot override contrary or conflicting federal statutes. *See, e.g., Bowers v. Windstream Ky. East, LLC,* 709 F. Supp. 2d 526, 539-40 (W.D. Ky. 2010). The Tariff cannot require AT&T to take some kind of action within a shorter period of time than that provided by Section 415.

I conclude that AT&T's failure to strictly comply with the Tariff's notice requirements does not entitle GLCC to judgment as a matter of law. AT&T's email message of May 2, 2012, expressly referenced GLCC's invoice dated April 1, 2012, explained the grounds for disputing the invoice and advised GLCC that AT&T would continue to withhold payment on future invoices until the concerns set forth in AT&T's message were resolved. While AT&T sent the message to a GLCC employee other than the one specified in the Tariff, it is undisputed that the message was forwarded to the correct individual almost immediately. Viewing the record most favorably to AT&T, I conclude that these actions satisfied the legitimate purpose of the notice

---

[11] Providing, in relevant part, as follows:

> For recovery of overcharges action at law shall be begun or complaint filed with the Commission against carriers within two years from the time the cause of action accrues, and not after, subject to subsection (d) of this section, except that if claim for the overcharge has been presented in writing to the carrier within the two-year period of limitation said period shall be extended to include two years from the time notice in writing is given by the carrier to the claimant of disallowance of the claim, or any part or parts thereof, specified in the notice.

47 U.S.C. § 415(c).

requirements by advising GLCC of the dispute and giving it the opportunity to investigate and resolve that dispute. I therefore recommend that GLCC's motion for summary judgment be **denied** for this reason, as well.

### b. *Payment Requirement*

The Tariff requires Buyers to pay all charges as a condition of disputing them. *See* Doc. No. 17-3 at 43 ("Prior to or at the time of submitting a good faith dispute, Buyer shall tender payment for any undisputed amounts, as well as payment for any disputed charges relating to traffic in which the Buyer transmitted an interstate telecommunications to the Company's network."). Here, there is no dispute that AT&T failed to comply with this requirement with regard to most, if not all, of the charges at issue. The question, then, is whether this failure compels entry of judgment in GLCC's favor as a matter of law.

GLCC argues that AT&T's failure to pay constitutes a waiver of AT&T's right to dispute those charges. GLCC again relies on the "deemed lawful" language of 47 U.S.C. § 204(a)(3) to argue that AT&T must comply with all terms and conditions of the Tariff, unless and until it is declared unlawful by either the FCC or the court. As noted above, it is undisputed that the Tariff obtained "deemed lawful" status on January 26, 2012. Accordingly, GLCC asserts that as long as it provided the services AT&T was billed for, AT&T is required to pay.[12]

AT&T responds that while the Tariff may be "deemed lawful," GLCC has breached the Tariff by billing for services contrary to its terms, resulting in charges that are unjust and unreasonable under 47 U.S.C. § 201(b). AT&T contends it does not

---

[12] GLCC also relies on the *CLEC Access Charge Order*, in which the FCC stated in its overview of the structure of the access service market that "The Act and our rules require IXCs to pay the published rate for tariffed CLEC access services, absent an agreement to the contrary or a finding by the Commission that the rate is unreasonable." 16 FCC Rcd. 9923, ¶ 28 (2001).

have to provide payment as a condition of disputing the charges under these circumstances. *See AT&T Corp. v. YMax Commc'ns*, 26 FCC Rcd. 5742, ¶ 12 (2011) ("a carrier may lawfully assess tariffed charges only for those services specifically described in its applicable tariff."). According to AT&T, GLCC's attempt – via its Tariff – to compel a contrary result is unreasonable and, therefore, unenforceable.

AT&T relies in large part on *Sprint Commc'ns L.P. v. Northern Valley Commc'ns, LLC*, 26 FCC Rcd. 10780, ¶ 14 (2011), *aff'd*, 717 F.3d 1017 (D.C. Cir. 2013) (*Northern Valley*). In that case, the FCC found that a nearly identical billing dispute provision was unreasonable. That provision required all disputed charges to be paid "in full prior to or at the time of submitting a good faith dispute." 26 FCC Rcd. 10780, ¶ 14 (2011).

GLCC attempts to distinguish *Northern Valley* and, indeed, claims that it drafted the Tariff's billing dispute provisions to comply with that case. Doc. No. 17-2 at ¶ 5. GLCC argues that the FCC's disapproval of the advance payment requirement applies only when "no services are provided at all." Doc. No. 17-1 at 22 n.10. In making that argument, however, GLCC selectively quotes from an example provided by the FCC. The entire sentence is as follows: "As written, this provision requires everyone to whom Northern Valley sends an access bill to pay that bill, no matter what the circumstances (including, for example, if no services were provided at all), in order to dispute a charge." 26 FCC Rcd. 10780, ¶ 14 (2011). The FCC did not state that an advance payment requirement is unreasonable *only* when no services were provided in connection with the disputed invoice.

Here, AT&T contends GLCC has invoiced it for charges that are contrary to the Tariff. Based on *Northern Valley*, I find that the Tariff's purported requirement of prepayment as a condition of disputing those charges is unreasonable. As such, I

recommend that GLCC's motion for summary judgment be **denied** for this reason, as well.

## VIII. CONCLUSION AND RECOMMENDATION

For the reasons set forth herein, I RESPECTFULLY RECOMMEND that GLCC's motion (Doc. No. 17) be **granted in part** and **denied in part**, as follows:

1. With regard to GLCC's argument that AT&T lacks standing to assert any of its counterclaims, I recommend that GLCC's motion be **denied without prejudice** and that, if this recommendation is adopted, AT&T be directed to file an amended counterclaim to cure its failure to plead sufficient facts demonstrating actual injury no later than twenty (20) days after entry of the order so adopting this recommendation. GLCC would then be free to file a renewed motion to dismiss, based on its standing argument, if AT&T's amended pleading does not resolve the deficiency.

2. With regard to GLCC's argument that Count I of AT&T's counterclaim must be dismissed, I recommend that GLCC's motion be **denied**.

3. With regard to GLCC's argument that Count II of AT&T's counterclaim must be dismissed, I recommend that GLCC's motion be **granted**, and Count II **dismissed without prejudice**, pursuant to the primary jurisdiction doctrine.

4. With regard to GLCC's argument that Count III of AT&T's counterclaim must be dismissed, I recommend that GLCC's motion be **granted**, and Count III **dismissed without prejudice**, pursuant to the primary jurisdiction doctrine.

5. With regard to GLCC's motion for summary judgment on the issue of AT&T's liability to GLCC, I recommend that the motion be **denied.**

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the

parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **IT IS SO ORDERED.**

      **DATED** this 24th day of June, 2014.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE